**Thomas P. Smith, Jr.**
**Sandeep Satwalekar**
**Travis Hill**
**Elizabeth Butler**
**Mao Yu Lin**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-9135 (Hill)**
**HillTr@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>       -against-<br><br>**JEREMY JORDAN-JONES,**<br><br>                              **Defendant.** | **COMPLAINT**<br><br>**25 Civ. 4297**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Jeremy Jordan-Jones ("Jordan-Jones"), alleges as follows:

### SUMMARY

1. Between at least November 2021 and February 2022 (the "Relevant Period"), Jordan-Jones, a self-proclaimed "serial entrepreneur," made multiple material misrepresentations to a venture capital firm ("Investor A") that invested $500,000 in Amalgam Capital Ventures LLC ("Amalgam")—a start-up technology company that Jordan-Jones co-founded and for which he was the chief executive officer—for the purported purpose of launching a blockchain-based point-of-sale and payment processing platform called Zeo.

2. Rather than spending Investor A's funds to launch Zeo, Jordan-Jones misappropriated portions of the funds to pay personal expenses unrelated to Amalgam's business—including payments to a luxury car dealership, department stores, luxury clothing and accessory brands, and to purchase art.

3. To secure Investor A's investment, Jordan-Jones misrepresented to Investor A, among other things, that Zeo was operational, and that Amalgam had a significant positive cash balance, revenue-generating contracts, and assets worth over $3 million.

4. In fact, contrary to Jordan-Jones' representations to Investor A, Zeo was not operational, and Amalgam's cash balance was negative, it had no revenue-generating contracts, and its purported assets did not exist.

5. In late December 2021 and early January 2022, Investor A paid Amalgam $500,000 in exchange for a promissory note convertible to Amalgam's limited liability company ("LLC") membership interests or, if Amalgam later became a corporation, to its stock.

6. By February 24, 2022, Jordan-Jones had spent all of Investor A's $500,000 investment, primarily on expenses unrelated to Amalgam's purported business.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Jordan-Jones violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Jordan-Jones is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

10. The Commission seeks a final judgment: (a) permanently enjoining Jordan-Jones from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Jordan-Jones to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Jordan-Jones to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Jordan-Jones from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

12. Jordan-Jones, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)]

and Exchange Act Section 27 [15 U.S.C. § 78aa]. During the Relevant Period, Amalgam's principal place of business was located in this District. Additionally, certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including communications made into and from this District in furtherance of the fraud, at least one business meeting, and Jordan-Jones' use of investor funds for certain personal expenditures within the District.

## DEFENDANT

14. **Jordan-Jones**, age 33, is a U.S. citizen whose current address is unknown. His last known addresses were in Boston, Massachusetts; New York, New York; and Arlington, Virginia. At all relevant times, Jordan-Jones was the CEO and one-third shareholder of Amalgam, which he founded in January 2021.

## OTHER RELEVANT ENTITY

15. **Amalgam** is a Delaware LLC with its principal place of business in New York, New York. Amalgam purported to be a start-up technology company with several purported lines of business, including a supposed payment processing platform. Pursuant to Amalgam's LLC Operating Agreement, dated January 26, 2021, Amalgam had three "Members" or shareholders, each with a one-third interest in the company. Jordan-Jones was an Amalgam Member. During the Relevant Period, Amalgam's principal place of business was 99 Wall Street, New York, New York, and Jordan-Jones, with other Amalgam executives, occasionally conducted Amalgam meetings in Manhattan, including at the Dominick, a luxury hotel.

## FACTS

I.  **BACKGROUND: JORDAN-JONES AND AMALGAM**

16. In January 2021, Jordan-Jones co-founded Amalgam, which, according to its

former website, marketing materials, and other corporate documents is a technology company that claims to have designed and developed innovative blockchain-based software solutions.

17. During the Relevant Period, Amalgam's former website, as well as Amalgam pitch decks and other corporate documents, claimed that the company used blockchain technology to support multiple digital solutions such as data security and storage, payment, crypto assets, supply chain management, and a web browser.

18. During the Relevant Period, one of Amalgam's purported products was Zeo, which Amalgam's website described as "a borderless payment gateway and payment engine" that "leverages blockchain technology" to allow "users to pull funds from any bank account in the US, Europe, Latin America, or Africa to fund a digital wallet with fiat or cryptocurrency and settle in any denomination instantly."

19. Zeo, however, was not operational during the Relevant Period.

## II. JORDAN-JONES MADE MATERIAL MISREPRESENTATIONS TO INVESTOR A REGARDING ZEO

20. In 2021, Jordan-Jones approached several venture capital firms to solicit investments in Amalgam for the purported purposes of acquiring licensing and infrastructure to support Zeo and for general use in Amalgam's business.

21. In October 2021, Jordan-Jones was introduced to Investor A, a venture capital firm, as a possible Amalgam investor.

22. In November 2021, Jordan-Jones provided Investor A with materials concerning Amalgam, including a product deck (the "Product Deck") and a due diligence report ("Due Diligence Report"). The Due Diligence Report contained a purported balance sheet for Amalgam ("Balance Sheet"), a capitalization table, a statement of earnings ("Statement of Earnings"), and a summary explaining how Amalgam would use any investment that Investor A

made in Amalgam.

23. Jordan-Jones drafted the Product Deck.

24. Jordan-Jones provided the Due Diligence Report to Investor A with a cover letter signed by Jordan-Jones.

25. Amalgam's Product Deck falsely claimed that Amalgam had the necessary technical capabilities and infrastructure to launch Zeo.

26. In fact, throughout the Relevant Period, Amalgam did not possess the necessary technical capabilities and infrastructure to launch Zeo.

27. The materials that Amalgam provided to Investor A, including the Due Diligence Report, indicated that Amalgam maintained offices in Manhattan.

28. Amalgam's Product Deck further claimed that Amalgam had contracts in place to generate minimum annual revenue of $39 million, scaling up to $495 million.

29. This statement was false. During the Relevant Period, Amalgam had no contractual agreements with any financial institutions and had not onboarded any payment service providers.

30. Nor, during the Relevant Period, did Amalgam have any agreements with or any commitments from any merchants, to use Zeo.

31. The Balance Sheet provided to Investor A represented that Amalgam's third-quarter 2021 "cash and cash equivalents" totaled $101,899.15.

32. This was false. In fact, Amalgam's account balance was negative during the third and fourth quarters of 2021.

33. Indeed, Amalgam's bank records demonstrate that its bank account had a balance of -$101,830.50 at the beginning of the third quarter of 2021, and that that negative balance

increased to $103,440.34 by the end of that quarter.

34. Due to Amalgam's lack of cash and revenue, Amalgam was unable to meet payroll or make any purchases in the third quarter of 2021—it owed its employees approximately $475,000 in backpay and had service contracts cancelled by multiple providers for failing to remit any payment.

35. The Balance Sheet also falsely claimed that Amalgam owned $3,062,351.58 in "IP/Equipment."

36. The Balance Sheet further falsely represented that Amalgam had two "current patent hold[s] pending" for "trade secrets."

37. In fact, a public search reveals that, during the Relevant Period, Amalgam had no patents or pending patent applications and no intellectual property.

38. The Statement of Earnings falsely claimed that Amalgam had paid licensing fees of $1,164,222 in the fourth quarter of 2021.

39. In fact, no licensing fees were ever paid from Amalgam's bank account, nor did it have sufficient funds to pay such fees from its bank account from at least July 1 through December 27, 2021.

40. The Statement of Earnings further falsely and/or misleadingly claimed that Amalgam would begin to generate revenue in the fourth quarter of 2021 from certain cannabis companies and that it would begin generating revenue in the first quarter of 2022 from a professional basketball team ("Basketball Team A") that competes in the NBA.

41. However, during the Relevant Period, Amalgam had no contracts with companies in the cannabis industry, professional basketball teams, or any other entity that would have been a source of revenue for Amalgam.

42. Jordan-Jones knew or recklessly disregarded that the representations contained in the Due Diligence Report (including the Balance Sheet and the Statement of Earnings) he provided to Investor A were false and/or misleading because Jordan-Jones knew that Zeo was not operational; Amalgam was in financial distress; and Amalgam had no revenue-generating contracts, no patents or pending patent applications, and no intellectual property.

43. Jordan-Jones represented in the Due Diligence Report that Amalgam required approximately $350,000 to acquire specified infrastructure that was purportedly needed for the company to carry out its business plan. The specified infrastructure included six physical servers; five virtual servers; user interfaces, coding and architecture; integration with "major card network(s)"; and licensing and gateway fees.

44. However, as described in more detail below, instead of using Investor A's money as promised—to fund Amalgam's purported infrastructure and operational needs—Jordan-Jones spent Investor A's money on his own personal expenses and to pay off existing Amalgam debt.

### III.   INVESTOR A INVESTS $500,000 IN AMALGAM

45. On December 28, 2021, after receiving the Product Deck and the Due Diligence Report (which included the Balance Sheet and Statement of Earnings) containing Jordan-Jones' above misrepresentations concerning Zeo, Investor A agreed to invest $500,000 in Amalgam in exchange for a convertible promissory note (the "Note")—*i.e.*, a note that could be converted into equity in Amalgam—to be funded in two installments of $250,000 each.

46. Jordan-Jones signed the Note as Amalgam's CEO.

47. According to its written terms, the Note was convertible to "Conversion Securities," which could be either LLC membership interests in Amalgam or, if Amalgam converted to a corporation, Amalgam stock.

48. The Note's maturity date was December 27, 2023.

49. The Note referred to Investor A as an "investor."

50. The Note stated that it "and any securities into which this convertible promissory note is convertible have been acquired for investment[.]"

51. Under the Note's terms, Investor A was entitled to "simple interest ('Interest') at the rate of 7.0% per annum . . . ."

52. Investor A was permitted to convert the note into "Conversion Securities" under several scenarios.

53. The Note defined "Conversion Securities" as "the highest-ranking class, series or designation of the Company's Units . . . ."

54. The Note defined "Units" as "limited liability company membership interests of the Company," or "[i]f the Company has converted to a corporation . . . the term 'Units' will refer to capital stock of the Company."

55. The Note was neither collateralized nor insured.

56. Pursuant to the Note, "[n]either party may assign its rights or delegate its duties without the prior written consent of the other party."

57. The Note listed Amalgam's address as 99 Wall Street, New York, New York.

58. Along with the Note, Investor A and Amalgam executed an "Investor Rights Letter" dated December 23, 2021, and signed by Jordan-Jones and an Investor A representative (the "Letter").

59. The Note expressly incorporated the Letter by reference.

60. The Letter outlined a number of restrictions, including that, under certain circumstances, Amalgam would need Investor A's approval before "[d]istributing cash or

property to [Amalgam's] [M]embers . . ."

61. Pursuant to the Note, Investor A was to pay Amalgam the principal amount of $500,000 in two equal installments of $250,000.

62. Investor A made its first $250,000 installment payment to Amalgam on or about December 29, 2021.

63. Investor A made its second $250,000 installment payment to Amalgam on or about January 3, 2022.

64. Investor A's funds were deposited into an Amalgam bank account, for which Jordan-Jones was the sole account holder and the sole signatory (the "Amalgam Account").

65. During the Relevant Period, other than miscellaneous purchase refunds totaling approximately $100, the Amalgam Account was funded solely by Investor A's $500,000 investment.

## IV. JORDAN-JONES MISAPPROPRIATES INVESTOR A'S INVESTMENT

66. On December 29, 2021, the same day that Amalgam received Investor A's initial $250,000 installment on the Note, Jordan-Jones transferred $55,000 from the Amalgam Account to another Amalgam Member ("Amalgam Member 1").

67. The following day, December 30, 2021, Jordan-Jones paid $4,265 to an event planner to provide champagne and servers for a New Year's Eve party in Manhattan.

68. Between December 29 and 31, 2021, Jordan-Jones withdrew an additional $27,000 in cash from the Amalgam Account.

69. On January 3, 2022, Investor A wired the second $250,000 installment to the Amalgam Account.

70. The same day, Jordan-Jones spent over $500 from the Amalgam Account at a

sports apparel store in the SoHo neighborhood of Manhattan and withdrew an additional $5,500 in cash from the Amalgam Account.

71. Between December 29, 2021, and January 31, 2022, Jordan-Jones transferred more than $40,000 from the Amalgam Account to Amalgam employees as backpay.

72. Between January 3 and February 3, 2022, Jordan-Jones withdrew nearly $50,000 in cash from the Amalgam Account.

73. Between January 4 and 6, 2022, Jordan-Jones made additional transfers totaling $30,000 into the bank account of Amalgam Member 1.

74. In addition to the above, Jordan-Jones spent at least $111,000 of the $500,000 obtained from Investor A to pay his personal expenses, including the following approximate amounts: $38,000 at a luxury vehicle dealer in Virginia; $47,000 on hotels, including $26,000 at a luxury hotel in New York City; $12,000 shopping, including at luxury retailers; $4,000 on entertainment; $8,000 on travel and transportation expenses; and $2,000 on restaurants.

75. By February 24, 2022, Jordan-Jones had spent Investor A's entire investment, and the Amalgam Account balance was zero.

76. Contrary to Jordan-Jones' prior representations to Investor A, neither Jordan-Jones nor Amalgam spent any of Investor A's funds on computer hardware or software, or licensing or integration fees associated with credit card networks.

77. Also contrary to Jordan-Jones' prior representations to Investor A that Amalgam would not distribute cash or property to its Members without Investor A's approval, Jordan-Jones, who is an Amalgam Member, sought no such approval before making multiple cash withdrawals for himself, paying personal expenses, and distributing Investor A's investment funds to Amalgam Member 1 (as described in paragraphs 66 and 73 above).

78. In or around June 2022, Jordan-Jones requested additional funding from Investor A.

79. In connection with that request, Jordan-Jones provided Investor A with a slide deck (the "Slide Deck").

80. In the Slide Deck, Jordan-Jones claimed that Amalgam had spent 32.98% of Investor A's investment on "IT/Hardware" and 19.68% on "Licensing."

81. As Jordan-Jones knew or recklessly disregarded, his representations in the Slide Deck as to how Amalgam had spent Investor A's investment funds were false; as detailed in paragraphs 66-76, Jordan-Jones did not spend any of Investor A's investment funds on "IT/Hardware" or "Licensing."

82. Investor A did not make a second investment in Amalgam.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

83. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 82.

84. Jordan-Jones, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

85. By reason of the foregoing, Jordan-Jones, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

86. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 82.

87. Jordan-Jones, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

88. By reason of the foregoing, Jordan-Jones, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Jordan-Jones and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or

indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Jordan-Jones to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Jordan-Jones to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently barring Jordan-Jones from acting as an officer or director of any public company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.


Dated: New York, New York
May 21, 2025

*/s/ Travis Hill*
_____
TRAVIS HILL
Thomas P. Smith, Jr.
Sandeep Satwalekar
Elizabeth Butler
Mao Yu Lin
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9135 (Hill)
HillTr@sec.gov